SAMUEL M. LONGIOTTI AND MELVIN M. STEIN, D/B/A SUMPTER
SQUARE ASSOCIATES, A PARTNERSHIP v. WACHOVIA BANK &
TRUST COMPANY, INC. N.A.

No. 7421SC1014

(Filed 7 May 1975)

1. Damages § 7— change in permanent lender — loss to construction lender
— charge of liquidated damages proper

The trial court properly granted defendant's motion for summary
judgment in an action by plaintiff to recover a $27,000 payment made
to defendant where defendant was the construction lender, Aetna Life
Insurance Company was the long-term lender, and plaintiff was the
borrower; plaintiff made arrangements with another permanent lender
and requested that defendant, who had an agreement with Aetna to
service Aetna's long-term loan, terminate plaintiff's obligations with
Aetna; defendant did make arrangements with Aetna for its pay-off;
and defendant also charged plaintiff an additional $27,000 for "liqui-
dated damages" for loss of servicing the permanent loan of Aetna.

2. Contracts § 27; Duress— contract signed under duress — insufficiency
of evidence

Where plaintiff stood to lose $70,000 in a standby fee with a
prospective permanent lender unless defendant construction lender

gave up its interest in the transaction between plaintiff and its original permanent lender, requirement by defendant that plaintiff pay it $27,000 in liquidated damages before defendant would release such interest did not amount to economic duress.

APPEAL by plaintiffs from *Exum, Judge*. Judgment entered 29 August 1974 in Superior Court, FORSYTH County. Heard in the Court of Appeals 14 February 1975.

Plaintiffs brought this action seeking to recover a $27,000 payment made to defendant. For the most part, the facts are undisputed. Sumpter Square, Inc., a North Carolina corporation, was formed for the purpose of building an apartment project known as "Sumpter Square Apartments." The estimated cost of the project was $3.1 million. Being unable to fund such an undertaking, Sumpter Square, Inc., sought to borrow money for construction and permanent financing. Negotiations ensued and ultimately led to execution of the following documents.

A letter of commitment, dated 15 October 1969, was issued by Aetna Life Insurance Company (Aetna) whereby Aetna approved a first mortgage loan in the maximum amount of $2.7 million for a term of 26 years with interest at 9.75% per annum. In order to fill the gap between $2.7 million and $3.1 million, additional financing of approximately $400,000.00 was obtained from Westinghouse Credit Corporation. (The $400,000.00 loan is not pertinent to this case except for the fact that the construction lender required such financing prior to any disbursements of the construction loan.) On 14 January 1970, Sumpter Square, Inc., through Samuel Longiotti, accepted a letter from Wachovia Bank & Trust Company (Wachovia) as its commitment for a construction loan. Thereafter, on 2 February 1970 a "Buy and Sell Agreement" was executed by Wachovia, Aetna and Sumpter Square, Inc. This agreement provided in summary and in part that:

(1) The construction loan would be represented by a deed of trust note of the borrower (Sumpter Square, Inc.), secured by a first deed of trust;

(2) Upon receipt of the purchase price, Wachovia would endorse the deed of trust note to Aetna;

(3) Prior to the expiration of the Aetna commitment, Wachovia would not release any part of the security or accept payment or prepayment thereof or accelerate the maturity unless Sumpter Square, Inc. should default;

(4) Aetna would purchase the deed of trust note from Wachovia on or after 10 October 1971, but before expiration of Aetna's commitment, and subject to certain requirements being met such as completion of the project;

(5) Aetna would be guaranteed payment of a standby fee of $54,000.00 in the event the loan did not close in accordance with Aetna's letter of commitment—$27,000.00 of this amount to be released by Aetna upon the initial disbursement of construction money by Wachovia and the remaining $27,000.00 to be released in the event the loan closed to Aetna;

(6) Sumpter Square, Inc. would accept the construction loan and the permanent loan and would not "pay or prepay said construction loan in whole or in part or accept a permanent first mortgage loan from any lender other than Company (Aetna) during the term of this agreement or any extension thereof. . . ." (Parenthetical information added.)

Sumpter Square, Inc., then executed a deed of trust note to Wachovia in the amount of $2.7 million with interest at 14% per annum, payable on the first day of each month to and including 1 November 1971. After 1 November 1971 the note would bear interest at 9¾% per annum with payments of $23,846.40 on 1 December 1971 and a like amount on the first day of each month until 1 November 1997 at which time the remaining principal and interest would be due. Additional payments on the principal could be made as follows:

"Beginning twelve years from the date of the first level monthly repayment of principal and interest as called for herein, the entire balance hereof may be prepaid on sixty (60) days prior written notice upon payment of a surrender charge of three percent (3%) of the principal balance then owing; said surrender charge to diminish one-half of one per cent per year until sixteen years after the first level monthly repayment; thereafter, the entire balance may be paid in full or paid in part upon payment of a surrender charge of one per cent (1%) of the amount so paid."

Subsequently, the property involved was conveyed to plaintiffs doing business as Sumpter Square Associates. As construction of the apartment project proceeded, it became apparent to

plaintiffs that their loan commitments would be insufficient. By a letter dated 10 February 1971, Mr. Longiotti, on behalf of Sumpter Square Associates, notified Wachovia that the project warranted a loan of approximately $3.5 million due to various economic factors. (At this time the permanent loan commitments totaled about $3.1 million.) He asked Wachovia to explore the possibility of an increased loan and to pursue whatever was necessary in that regard with the permanent lender. Since Aetna was reluctant to commit additional funds, plaintiffs sought financing from another source—Western Savings Society of Philadelphia (Western).

On 12 April 1971, Western issued its letter of commitment for a loan of $3.5 million at an interest rate of 8¾% and for a term of 27 years. Western conditioned its commitment upon receiving a first lien on the property—a requirement which meant that plaintiffs had to secure a release from the permanent loan commitment with Aetna and had to satisfy the construction loan obligation with Wachovia. In a letter dated 25 May 1971, plaintiffs informed Wachovia that they were making arrangements with another permanent lender (Western) and requested that their obligations to Aetna be terminated. Plaintiffs also indicated their readiness to pay off the construction loan. Wachovia wrote to plaintiffs, stating that a 1% fee of $27,000.00 would have to be paid to Aetna (see the standby fee in the "Buy and Sell Agreement") and that an additional $27,000.00 must be paid to Wachovia as "liquidated damages" for the loss of servicing the permanent loan of Aetna. (Wachovia had an arrangement with Aetna whereby it would service the long-term Aetna loan to Sumpter Square, Inc.) Aetna received its $27,000.00 standby fee and released plaintiffs from the permanent loan agreement with Aetna. However, it was also necessary for plaintiffs to pay off the construction loan of Wachovia and cancel the existing deed of trust because Western required a first lien. Furthermore, since Western's commitment expired 6 November 1971 and entailed the loss of a $70,000.00 standby fee in the event that the loan with Western failed to close before this date, plaintiffs' need to free the property of existing encumbrances became more urgent. Plaintiffs satisfied the construction loan and paid Wachovia the $27,000.00 premium under protest, feeling that Wachovia was not entitled to same. They secured their loan of $3.5 million from Western and brought this action to recover the $27,000.00 payment made to Wachovia.

Both parties moved for summary·judgment. Being of the opinion that there was no genuine issue as to the material and operative facts and that from these facts it appeared that the $27,000.00 was received by Wachovia in consideration of the relinquishment of valuable contract rights and that it was not paid by plaintiffs under duress, the trial court denied plaintiffs' motion and allowed defendant Wachovia's motion for summary judgment. Plaintiffs appealed.

*Midgette, Page, Higgins & Niles, by Robert J. Page, for plaintiff appellants.*

*Womble, Carlyle, Sandridge & Rice, by Grady Barnhill, Jr., and Ralph K. Frasier, for defendant appellee.*

MARTIN, Judge.

Plaintiffs contend that Wachovia had no legal right to the added payment of $27,000.00 in return for relinquishing its rights and the deed of trust. Their contention is based upon two arguments. First, it is argued that a "thorough examination of the documents executed by Aetna, Wachovia and Appellants reveals no provision for liquidated damages, or any other payment to Wachovia if the permanent loan did not close with Aetna." Secondly, they argue that the money was paid to Wachovia under conditions which amounted to economic duress.

The present case is comprised of a complex financial arrangement involving real estate developers, a construction lender, and a permanent or long-term lender. An examination of the nature of their arrangement is imperative at this point. What immediately follows has been culled from the affidavits and depositions submitted to the trial court for consideration.

[1] In order for lenders to gain a degree of certainty before a construction project begins, it is the practice to establish the rights and duties of the parties at the outset by means of various documents as found in the present case. One such document is the buy-sell agreement. The buy-sell agreement is executed by all three parties for the purpose of preventing the borrower from abrogating existing loan agreements in favor of a more attractive loan. Thus, the long-term loan and the construction loan are represented by the same documents, and upon completion of construction, the construction lender merely assigns and transfers the documents to the long-term lender. While the con-

struction lender's role is only temporary, he often, as here, expects to receive future income by "servicing" the long-term loan after being paid off or "taken out" by the long-term lender. Servicing the long-term loan can involve collecting monthly loan payments and interest, taking care that the property taxes are paid, and inspecting the property from time to time in order to advise the long-term lender of the condition of his security.

In the present case Wachovia rightfully expected to receive future income, for it had an agreement with Aetna to service Aetna's long-term loan. According to defendant's affidavits, the income from servicing a loan was important to Wachovia and represented a major inducement for locating and securing a long-term lender. The documents, such as the buy-sell agreement, were intended to assure the lenders of their respective rights to the benefits of the transaction as originally contemplated. When plaintiffs wanted out of the arrangement, Wachovia was holding a deed of trust on the property. We find nothing wrong in Wachovia's requirement that it receive a 1% premium in addition to satisfaction of the construction loan in return for releasing its interest in the transaction. There is no contention that the premium was excessive in light of Wachovia's lost expectations.

[2] In addition, we disagree with plaintiffs' claim that the payment was exacted under conditions amounting to economic duress. Clearly, plaintiffs' position was not an enviable one for they stood to lose a $70,000.00 standby fee to Western unless Wachovia gave up its interest in the transaction. On the other hand, it cannot be said that Wachovia was in any way responsible for plaintiffs' predicament. (Indeed, part of the cost overrun on the project appears due to the addition of a "Day Care Center" which involved between $150,000.00 and $175,000.00.) The duress must be found, if at all, in Wachovia's decision to stand on its valuable contractual and property rights. It was not required by law to release these rights and its demand for a 1% premium to do so was neither wrongful nor excessive.

Plaintiffs also refer to the 1% premium as usurious. We see nothing in the way of usury here. The transaction of which plaintiffs complain was the very reverse of a loan for, as stated in *Smithwick v. Whitley*, 152 N.C. 366, 67 S.E. 914 (1910), "[i]t put an end to credit instead of giving it."

The order of the trial court allowing defendant's motion for summary judgment is affirmed.

Affirmed.

Judges PARKER and VAUGHN concur.